Daniel P. Simpson (DS9856)
NEWMAN & SIMPSON, LLP
32 Mercer Street
Hackensack, New Jersey  07601
(201) 487-0200
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Sun Healthcare Group, Inc., a Delaware corporation; Mediplex Management, Inc., a Massachusetts corporation; Mediplex of Connecticut, Inc., a Connecticut corporation; Mediplex of Massachusetts, Inc., a Massachusetts corporation; Quality Nursing Care of Massachusetts, Inc., a Massachusetts corporation; Mediplex Rehabilitation of Massachusetts, Inc., a Massachusetts corporation; Mediplex of New Jersey, Inc., a New Jersey corporation; Bergen Eldercare, Inc., a New Jersey corporation; SunBridge Rehab of Colorado, Inc., a Colorado corporation; West Jersey/Mediplex Rehabilitation Limited Partnership, a New Jersey limited partnership; Mediplex of Kentucky, Inc., a Kentucky corporation; New Bedford Nursing Center, Inc., a Massachusetts corporation; Worcester Nursing Center, Inc., a Massachusetts corporation; Regency Rehab Hospitals, Inc., a California corporation; San Joaquin Valley Rehabilitation Hospital, L.P. a Delaware limited partnership; and | Civil Action No. 04-1202 (HAA)<br><br><br>AMENDED COMPLAINT AND JURY DEMAND |

Mediplex of Maryland, Inc., a
Maryland corporation.

        **Plaintiffs,**

    **vs.**

THCI Company LLC, a Delaware
limited liability company; 710
Long Ridge Road, LLC, a
Delaware limited liability
company; 710 Long Ridge Road
Operating Company II, LLC, a
Delaware limited liability
company; 2028 Bridgeport
Avenue, LLC, a Delaware limited
liability company; 2028
Bridgeport Avenue Operating
Company II, LLC, a Delaware
limited liability company; 240
Church Street, LLC, a Delaware
limited liability company; 240
Church Street Operating Company
II, LLC, a Delaware limited
liability company; 341 Jordan
Lane, LLC, a Delaware limited
liability company; 341 Jordan
Lane Operating Company, LLC), a
Delaware limited liability
company; 599 Boston Post Road,
LLC, a Delaware limited
liability company; 599 Boston
Post Road Operating Company II,
LLC, a Delaware limited
liability company; 245 Orange
Avenue, LLC, a Delaware limited
liability company; 245 Orange
Avenue Operating Company II,
LLC, a Delaware limited
liability company; 2101
Washington Street Operating
Company, LLC, a Delaware
limited liability company; 2101
Washington Street, LLC, a

Delaware limited liability company; 135 Benton Drive Operating Company, LLC, a Delaware limited liability company; 135 Benton Drive, LLC, a Delaware limited liability company; 260 Easthampton Road Operating Company, LLC, a Delaware limited liability company; 260 Easthampton Road, LLC, a Delaware limited liability company; 800 River Road Operating Company, LLC, a Delaware limited liability company; 800 River Road, LLC, a Delaware limited liability company; 600 Kinderkamack Road Operating Company, LLC, a Delaware limited liability company; 600 Kinderkamack Road, LLC, a Delaware limited liability company; 750 Woburn Street Operating Company, LLC, a Delaware limited liability company; 750 Woburn Street, LLC, a Delaware limited liability company; 19 Varnum Street Operating Company LLC, a Delaware limited liability company; 19 Varnum Street, LLC, a Delaware limited liability company; 8451 Pearl Street Operating Company, LLC, a Delaware limited liability company; 8451 Pearl Street, LLC, a Delaware limited liability company; 1 Burr Road, LLC, a Delaware limited liability company; 1 Burr Road Operating Company II, LLC, a Delaware limited liability company; 107 Osborne Street, LLC, a Delaware limited liability company; 107 Osborne

Street Operating Company II,
LLC, a Delaware limited
liability company; 162 South
Britain Road, LLC, a Delaware
limited liability company; 162
South Britain Road Operating
Company II, LLC, a Delaware
limited liability company; 199
Andover Street Operating
Company, LLC, a Delaware
limited liability company; 199
Andover Street, LLC, a Delaware
limited liability company; 70
Granite Street Operating
Company, LLC, a Delaware
limited liability company; 70
Granite Street, LLC, a Delaware
limited liability company; Two
Cooper Plaza Operating Company,
LLC, a Delaware limited
liability company; 2 Cooper
Plaza, LLC, a Delaware limited
liability company; 57 Old Road
to Nine Acre Corner Operating
Company, LLC a Delaware limited
liability company; 57 Old Road
to Nine Acre Corner SNF, LLC, a
Delaware limited liability
company; 57 Old Road to Nine
Acre Corner 2A and 2B, LLC, a
Delaware limited liability
company; 4499 Acushnet Avenue
Operating Company, LLC, a
Delaware limited liability
company; 4499 Acushnet Avenue,
LLC, a Delaware limited
liability company; 548 Elm
Street Operating Company, LLC,
a Delaware limited liability
company; 548 Elm Street, LLC, a
Delaware limited liability
company; 92 Brick Road
Operating Company, LLC, a
Delaware limited liability

company; 92 Brick Road, LLC, a Delaware limited liability company; 1300 Campbell Lane Operating Company, LLC, a Delaware limited liability company; 1300 Campbell Lane, LLC, a Delaware limited liability company; 49 Thomas Patten Drive Operating Company, LLC, a Delaware limited liability company; 49 Thomas Patten Drive, LLC, a Delaware limited liability company; 221 Fitzgerald Drive Operating Company, LLC, a Delaware limited liability company; 221 Fitzgerald Drive, LLC, a Delaware limited liability company; 312 Millbury Avenue Operating Company, LLC, a Delaware limited liability company; 312 Millbury Avenue, LLC, a Delaware limited liability company; 64 Performance Drive Operating Company, LLC, a Delaware limited liability company; 64 Performance Drive, LLC, a Delaware limited liability company; 1125 Sir Francis Drake Boulevard Operating Company, LLC, a Delaware limited liability company; 1125 Sir Francis Drake Boulevard, LLC, a Delaware limited liability company; 7173 North Sharon Avenue Operating Company, LLC, a Delaware limited liability company; 7173 North Sharon Avenue, LLC, a Delaware limited liability company; 19301 Watkins Mill Road Operating Company, LLC, a Delaware limited liability company;

19301 Watkins Mill Road, LLC, a
Delaware limited liability
company; 178 Lowell Street
Operating Company LLC, a
Delaware limited liability
company; 178 Lowell Street,
LLC, a Delaware limited
liability company; Care Realty
Funding LLC, a Delaware limited
liability company; Care Realty,
L.L.C., a Delaware limited
liability company; Care
Ventures, Inc., a Delaware
corporation; Care One, LLC, a
Delaware limited liability
company; THCI Holding Company
LLC, a Delaware limited
liability company; THCI
Mortgage Holding Company LLC, a
Delaware limited liability
company; and John Doe
Corporations (1-100)

                    **Defendants.**

Plaintiff **Sun Healthcare Group, Inc.** and all additional Plaintiffs named herein sharing a principal place of business at 101 Sun Avenue NE, Albuquerque, New Mexico, complaining of the Defendant **THCI Company LLC** and all additional Defendants named herein sharing a principal place of business at 411 Hackensack Avenue, Hackensack, New Jersey, 07601, say the following:

-6-

## JURISDICTION

1.   This matter arises from and is related to a bankruptcy, as is described more particularly below; accordingly, this Court has jurisdiction of this matter pursuant to 28 U.S.C.A. §1334.

## PARTIES

2.   Plaintiff, Sun Healthcare Group, Inc. ("Sun"), is a corporation incorporated under the laws of the State of Delaware and having its principal business offices located at 101 Sun Avenue NE, Albuquerque, New Mexico.   The other Plaintiffs are all direct or indirect subsidiaries or affiliates of Sun and share its principal business address.   They are as follows:

a)   Mediplex Management, Inc., a Massachusetts corporation,

b)   Mediplex of Connecticut, Inc., a Connecticut corporation,

c)   Mediplex of Massachusetts, Inc., a Massachusetts corporation,

d)   Quality Nursing Care of Massachusetts, Inc., a Massachusetts corporation,

e)   Mediplex Rehabilitation of Massachusetts, Inc., a Massachusetts corporation,

f)  Mediplex of New Jersey, Inc., a New Jersey corporation,

g)  Bergen Eldercare, Inc., a New Jersey corporation,

h)  SunBridge of Colorado, Inc., a Colorado corporation,

i)  West Jersey/Mediplex Rehabilitation Limited Partnership, a New Jersey limited partnership,

j)  Mediplex of Kentucky, Inc., a Kentucky corporation,

k)  New Bedford Nursing Center, Inc., a Massachusetts corporation,

l)  Worcester Nursing Center, Inc., a Massachusetts corporation,

m)  Regency Rehab Hospitals, Inc., a California corporation,

n)  San Joaquin Valley Rehabilitation Hospital, a Delaware limited partnership, and

o)  Mediplex of Maryland, Inc., a Maryland corporation.

3.  Defendant, THCI Company LLC ("THCI"), is a limited liability company organized under the laws of the State of Delaware and having its principal business offices located at 411 Hackensack Avenue, Hackensack, New Jersey, 07601. The other Defendants are all subsidiaries or affiliates of THCI, sharing its principal business address. They are as follows:

a) 710 Long Ridge Road, LLC, a Delaware limited liability company,

b) 710 Long Ridge Road Operating Company II, LLC, a Delaware limited liability company,

c) 2028 Bridgeport Avenue, LLC, a Delaware limited liability company,

d) 2028 Bridgeport Avenue Operating Company II, LLC), a Delaware limited liability company,

e) 240 Church Street, LLC, a Delaware limited liability company,

f) 240 Church Street Operating Company II, LLC, a Delaware limited liability company,

g) 341 Jordan Lane, LLC, a Delaware limited liability company,

h) 341 Jordan Lane Operating Company II, LLC, a Delaware limited liability company,

i) 599 Boston Post Road, LLC, a Delaware limited liability company,

j) 599 Boston Post Road Operating Company II, LLC, a Delaware limited liability company

k) 245 Orange Avenue, LLC, a Delaware limited liability company,

l)   245 Orange Avenue Operating Company II, LLC, a Delaware limited liability company,

m)   2101 Washington Street Operating Company, LLC, a Delaware limited liability company,

n)   2101 Washington Street, LLC, a Delaware limited liability company,

o)   135 Benton Drive Operating Company, LLC, a Delaware limited liability company,

p)   135 Benton Drive, LLC, a Delaware limited liability company,

q)   260 Easthampton Road Operating Company, LLC, a Delaware limited liability company,

r)   260 Easthampton Road, LLC, a Delaware limited liability company,

s)   800 River Road Operating Company, LLC, a Delaware limited liability company,

t)   800 River Road, LLC, a Delaware limited liability company,

u)   600 Kinderkamack Road Operating Company, LLC, a Delaware limited liability company,

v)   600 Kinderkamack Road, LLC, a Delaware limited liability company,

w)   750 Woburn Street Operating Company, LLC, a Delaware
     limited liability company,

x)   750 Woburn Street, LLC, a Delaware limited liability
     company,

y)   19 Varnum Street Operating Company LLC, a Delaware
     limited liability company,

z)   19 Varnum Street, LLC, a Delaware limited liability
     company,

aa)  8451 Pearl Street Operating Company, LLC, a Delaware
     limited liability company,

bb)  8451 Pearl Street, LLC, a Delaware limited liability
     company,

cc)  1 Burr Road, LLC, a Delaware limited liability
     company,

dd)  1 Burr Road Operating Company II, LLC, a Delaware
     limited liability company,

ee)  107 Osborne Street, LLC, a Delaware limited liability
     company,

ff)  107 Osborne Street Operating Company II, LLC, a
     Delaware limited liability company,

gg)  162 South Britain Road, LLC, a Delaware limited
     liability company,

hh)  162 South Britain Road Operating Company II, LLC, a Delaware limited liability company,

ii)  199 Andover Street Operating Company, LLC, a Delaware limited liability company,

jj)  199 Andover Street, LLC, a Delaware limited liability company,

kk)  70 Granite Street Operating Company, LLC, a Delaware limited liability company,

ll)  70 Granite Street, LLC, a Delaware limited liability company,

mm)  Two Cooper Plaza Operating Company, LLC, a Delaware limited liability company,

nn)  2 Cooper Plaza, LLC, a Delaware limited liability company,

oo)  57 Old Road to Nine Acre Corner Operating Company, LLC a Delaware limited liability company,

pp)  57 Old Road to Nine Acre Corner SNF, LLC, a Delaware limited liability company

qq)  57 Old Road to Nine Acre Corner 2A and 2B, LLC, a Delaware limited liability company,

rr)  4499 Acushnet Avenue Operating Company, LLC, a Delaware limited liability company,

ss) 4499 Acushnet Avenue, LLC, a Delaware limited liability company,

tt) 548 Elm Street Operating Company, LLC, a Delaware limited liability company,

uu) 548 Elm Street, LLC, a Delaware limited liability company,

vv) 92 Brick Road Operating Company, LLC, a Delaware limited liability company,

ww) 92 Brick Road, LLC, a Delaware limited liability company,

xx) 1300 Campbell Lane Operating Company, LLC, a Delaware limited liability company,

yy) 1300 Campbell Lane, LLC, a Delaware limited liability company,

zz) 49 Thomas Patten Drive Operating Company, LLC, a Delaware limited liability company,

aaa) 49 Thomas Patten Drive, LLC, a Delaware limited liability company,

bbb) 221 Fitzgerald Drive Operating Company, LLC, a Delaware limited liability company,

ccc) 221 Fitzgerald Drive, LLC, a Delaware limited liability company,

ddd) 312 Millbury Avenue Operating Company, LLC, a Delaware limited liability company,

eee) 312 Millbury Avenue, LLC, a Delaware limited liability company,

fff) 64 Performance Drive Operating Company, LLC, a Delaware limited liability company,

ggg) 64 Performance Drive, LLC, a Delaware limited liability company,

hhh) 1125 Sir Francis Drake Boulevard Operating Company, LLC, a Delaware limited liability company,

iii) 1125 Sir Francis Drake Boulevard, LLC, a Delaware limited liability company,

jjj) 7173 North Sharon Avenue Operating Company, LLC, a Delaware limited liability company,

kkk) 7173 North Sharon Avenue, LLC, a Delaware limited liability company,

lll) 19301 Watkins Mill Road Operating Company, LLC, a Delaware limited liability company,

mmm) 19301 Watkins Mill Road, LLC, a Delaware limited liability company,

nnn) 178 Lowell Street Operating Company LLC, a Delaware limited liability company,

ooo) 178 Lowell Street, LLC, a Delaware limited liability company,

ppp) Care One, LLC, a Delaware limited liability company,

qqq) Care Realty Funding LLC, a Delaware limited liability company,

rrr) THCI Holding Company LLC, a Delaware limited liability company,

sss) THCI Mortgage Holding Company LLC, a Delaware limited liability company,

ttt) Care Ventures, Inc., a Delaware corporation,

uuu) Care Realty, L.L.C., a Delaware limited liability company, and

vvv) John Doe Corporations (1-100), being corporations or other business organizations, whose identities are currently unknown to Plaintiffs.

## FACTUAL BACKGROUND

4.   Sun is a publicly-held holding company for various direct and indirect subsidiaries.  The business of those subsidiaries includes the operation of approximately 110 skilled nursing facilities, rehabilitation hospitals and clinics, which care for thousands of elderly residents and rehabilitation patients.   (Sun and its direct and indirect subsidiaries and

affiliates are hereinafter referred to collectively as the "Sun Entities.")

5. Skilled nursing facilities and rehabilitation hospitals, such as those operated by Sun, receive income from Medicare, Medicaid and from other insurers and third party payors for services rendered to their patients.

6. In 1994, certain Sun Entities acquired certain subsidiaries of the Mediplex Group, Inc. (collectively with its subsidiaries, "Mediplex"), which operated long-term healthcare businesses.

7. At the time of the acquisition, affiliates of the former Meditrust Corporation ("Meditrust"), a healthcare oriented real estate investment trust and the predecessor in interest of THCI Company, LLC in the real estate at which the healthcare businesses were operated, were the lessors of 29[1] skilled nursing facilities (the "Leased Facilities") acquired by the Sun Entities.

8. Meditrust affiliates likewise were the mortgagees of four facilities acquired from Mediplex by Sun Entities (the "Mortgaged Facilities" and, together with the Leased Facilities, the "Facilities").

---

[1] There were actually 30, one of which is not the subject of this litigation and is, therefore, not a "Leased Facility," as that term is defined in this Complaint.

-16-

9.   On October 14, 1999 (the "Petition Date"), Sun and certain Sun Entities (the "Sun Debtors") commenced cases under Chapter 11 of the Bankruptcy Code (Case No. 99-3657) (the "Sun Bankruptcy").

10. On February 6, 2002, the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") entered an order confirming the Sun Debtors' Joint Plan of Reorganization (the "Plan").

11. The Effective Date of the Plan occurred on February 28, 2002.

12. The Plan provides in §11.1(f) that the Delaware Bankruptcy Court retains jurisdiction "[t]o hear and determine any disputes or issues arising under . . . any . . . settlements of claims approved by the Bankruptcy Court."

13. The February 6, 2002 Order of the Delaware Bankruptcy Court approving the Plan provides in ¶26 that "[t]he Bankruptcy Court may properly retain jurisdiction over matters set forth in Section 11 of the Plan."

14. On or about November 3, 2000, approximately six months prior to the date on which the THCI Entities succeeded to the interests of the Meditrust affiliates in and to the real estate, the Sun Entities filed a motion before the Delaware Bankruptcy Court seeking the right to reject the leases pertaining to certain of the Facilities.

15. Nearly one year later, THCI initiated an adversary

proceeding, on September 21, 2001, seeking a determination by the Delaware Bankruptcy Court that the Sun Entities could not assume or reject the various THCI Facility leases on a facility-by-facility basis.

16. Ultimately, THCI and the Sun Entities entered into a settlement of the Sun Entities' motion and THCI's adversary proceeding, documented in a "Stipulation and Order," which was approved by the Delaware Bankruptcy Court on January 28, 2002 (the "First Stipulation").

17. Shortly thereafter, the parties entered into a "Supplemental Stipulation and Order," which was approved by the Court on February 4, 2002. The Supplemental Stipulation addressed the disposition of certain of the Mortgaged Facilities.

18. THCI did not agree to enter into new leases of the Facilities on the terms specified in the First Stipulation and Supplemental Stipulation, seeking instead to force a new renegotiation of the terms of the leases. The parties therefore could not consummate the settlement evidenced in the First Stipulation and Supplemental Stipulation.

19. On January 31, 2003, THCI filed the "Motion of THCI Company, LLC to Enforce Stipulation and Order and for Emergency Relief" (the "THCI Motion"). Pursuant to the THCI Motion, THCI sought relief from the alleged breach by the Sun Entities of obligations under the First Stipulation.

20. On February 14, 2003, Sun filed the "Objection of Sun Healthcare Group, Inc. to Motion of THCI Company, LLC to Enforce Stipulation and Order and for Emergency Relief" (the "Objection").

21. On April 21, 2003, in an effort to fully and finally resolve all outstanding disputes between the parties, including the THCI Motion and the Objection, the parties executed the "Stipulation and Order Re: Resolution of 'Motion of THCI Company, LLC to Enforce Stipulation and Order and for Emergent Relief'" (the "Stipulation"),[2] which was approved by the Delaware Bankruptcy Court and executed as an Order of the Court on April 28, 2003.

22. Pursuant to the Stipulation, the parties resolved disputes concerning alleged rental obligations, alleged lease rejections, alleged mortgage payments, reimbursement of certain net operating losses, and alleged material breaches by THCI of the First Stipulation and the Supplemental Stipulation.

23. A critical component of the Stipulation was the parties' mutual and binding agreement as to their respective rights, duties, obligations and mutual promises regarding the transfer of the Mortgaged Facilities and the operations of all of the Facilities (with one exception) by the Sun Entities that

---

[2] A true copy of the Stipulation with all of its exhibits is appended to this Complaint as Exhibit A.

operated them at the time (the "Sun Tenants")[3] to certain affiliates of THCI (the "New Operators").[4]    (THCI, the New Operators and any other party to this litigation that is affiliated with THCI as a subsidiary or through common ownership or control are hereinafter referred to collectively as the "THCI Entities.")

24.    The transfers of the Leased Facilities were accomplished pursuant to and upon the execution of substantively identical Operations Transfer Agreements (each an "OTA").[5]

25.    The transfers of the Mortgaged Facilities were accomplished pursuant to and upon the execution of substantively identical Deeds-in-Lieu/Mortgaged Facility Documents[6] and OTAs.

26.    The Stipulation provides at ¶18 as follows:

> This Stipulation, the OTAs and the Deed-in-Lieu/Mortgaged Facility Documents collectively constitute the entire agreement between the Parties . . .

---

[3] The Sun Tenants are identified in ¶2, parts a through o, of this Complaint.

[4] The New Operators are identified in ¶3, parts a through 11 of this Complaint.

[5] The form of OTA is appended to the Stipulation as Exhibit F and is expressly incorporated into and made a part of the Stipulation by reference.

[6] Two alternate forms of the Deed-in-Lieu/Mortgaged Facility Document are appended to the Stipulation as Exhibits B-1 and B-2 and are expressly incorporated into and made a part of the Stipulation by reference.

27. The Stipulation provides in the initial, unnumbered paragraph that the following are Parties to the Stipulation, along with the Sun Entities: "[THCI] and its Affiliates (as defined below) and subsidiaries, including, without limitation, the lessors under the Existing Leases (as defined below) and the mortgagees under the Existing Mortgages (as defined below) (collectively with THCI, the "THCI Entities") . . . ."

28. The Stipulation provides at ¶1(a) as follows:

> "Affiliate" of a person or entity means a person or entity which controls, is controlled by, or is under common control with such person or entity, where the term "control" means the power to direct the policies or management of a person or entity, whether by vote, contract or otherwise.

29. Notably, "Affiliates," as that term is defined in the Stipulation, includes officers and directors of THCI (the "Officers").

30. By operation of ¶¶1(a), 18 and the initial, unnumbered paragraph, each Defendant named herein is a party to the Stipulation and to each additional contract incorporated by reference into the Stipulation pursuant to ¶18, and all are, consequently, jointly and severally liable for the obligations of each under any and all of said contracts.

31.  The Stipulation provides at ¶29 as follows:

> The Parties agree that the Bankruptcy Court
> shall have jurisdiction, as a "core
> proceeding" over any action to enforce or
> interpret any provision of this Stipulation,
> and over any action arising under or
> relating to this Stipulation.

32.  ¶9 of the Stipulation provided for means by which a "Possession Date," meaning the date on which a New Operator was to take possession and control of a particular Facility, would be established as to each Facility. The Possession Date established as to each Facility was a crucial date in determining when many of the obligations provided for in each OTA were to take effect. The Possession Dates all occurred between May 1, 2003 and August 1, 2003.

33.  ¶1(y) of the Stipulation permits each New Operator to assign its obligations under a particular OTA to a "Subsequent Operator" so long as each such Subsequent Operator executes an "OTA Assignment and Assumption of Liabilities," pursuant to which each Subsequent Operator "agrees to perform all of the duties and obligations of Assignor under the [corresponding] OTA."

34.  Some of the New Operators did attempt assignments, but when the Subsequent Operators failed to obtain licenses and/or other government approvals required to operate the assigned

-22-

Facilities, same were assigned back to the original New Operators. Consequently, there have been, in actuality, no Subsequent Operators, and each New Operator has remained liable under its respective OTA.

35. Each OTA executed by a Sun Tenant and a New Operator provides at §6.1 as follows:

> Sun Tenant shall retain whatever right, title and interest it may have in and to all unpaid accounts receivable with respect to the Facility which relate to the period prior to the Possession Date, including, but not limited to, any accounts receivable arising from rate adjustments which relate to the period prior to the Possession Date even if such adjustments occur after the Possession Date ("Sun Tenant's A/R"). New Operator (i) acknowledges and agrees that it has been advised by Sun Tenant that the Lenders . . . have a perfected security interest in Sun Tenant's A/R under the terms of that Loan and Security Agreement dated February 28, 2002, as the same may be amended, modified or restated from time to time (the "Credit Agreement"), by and among [Sun] and certain affiliates thereof, as Borrowers, and [the Lenders and their "Agents"], (ii) shall do nothing to interfere with any and all rights that Sun Tenant's Lenders or the Agents may have in or with respect to Sun Tenant's A/R, including, but not limited to, the right to collect the same and to enforce any and all of their rights with respect to Sun Tenant's A/R, (iii) agrees that if it receives any proceeds with respect to the Sun Tenant's A/R, New Operator will hold such proceeds in trust for Sun Tenant's Lenders and shall promptly turn over those proceeds to Sun

Tenant's Lenders (until directed otherwise by Sun Tenant in writing) without demand, in the form received, without offset or deduction of any kind, to be applied to the Borrowers' obligations to the Lenders as the Lenders may determine (and Sun Tenant hereby waives any claim against the New Operator for turning such proceeds over to the Lenders in accordance with the terms hereof), (iv) acknowledges and agrees that the Lenders shall be intended third party beneficiaries of this Section 6.1 and accordingly shall be entitled to enforce the provisions of this Section 6.1 and (v) agrees to indemnify, defend and hold harmless Sun Tenant and the Lenders from any and all losses, costs, damages and expenses, including, but not limited to, reasonable attorneys fees, which Sun Tenant may incur in the event of a breach by New Operator of its obligations under this Section 6.1.

36. The "Lenders" included a number of creditors of the Sun Entities identified in §6.1 of the OTAs.[7]

37. Effective as of September 5, 2003, Sun entered into a Loan and Security Agreement, replacing the Lenders with CapitalSource Finance, LLC ("CapitalSource") and Wells Fargo Foothill, Inc. ("Wells Fargo"). (CapitalSource and Wells Fargo are hereinafter referred to collectively as "Sun Lenders.")

---

[7]  Identities of Sun's original Lenders have been omitted from the excerpt of §6.1, because they are no longer relevant, Sun having paid its term debt in full on July 15, 2003 and refinanced its revolving senior loan agreement as described in ¶37 *infra*.

38.  While Sun was negotiating its Loan and Security Agreement with the Sun Lenders, it became necessary to modify the OTAs to reflect the replacement of the Lenders therein with the Sun Lenders.  This replacement had absolutely no deleterious effect on the THCI Entities or their rights under the Stipulation or the OTAs.

39.  Nevertheless, the THCI Entities, in a demonstration of outrageous bad faith, refused to execute the necessary modification unless and until the Sun Entities agreed to pay real estate taxes on the Facilities and that had been discharged in the Sun Bankruptcy (the "Discharged Taxes").

40.  Contemporaneously with all of these dealings, a subsidiary of Sun, SunDance Rehabilitation Corporation ("SunDance"), had been providing and continued to provide the THCI Entities with various necessary rehabilitation therapy services at the Facilities.  The THCI Entities, in a further demonstration of bad faith and, in part, in a further effort to extort Sun to agree to pay the Discharged Taxes, have ceased paying for the Sundance services.

41.  On September 3, 2003, to evidence the agreement THCI exacted as a condition to signing the consents to the CapitalSource refinancing, THCI and Sun, acting on their own

behalves and on behalf of the THCI Entities and the Sun Entities, respectively, entered into a letter agreement ("Letter 1"). Letter 1 permitted the THCI Entities to set off the Discharged Taxes, as well as certain accrued Sun obligations under the Stipulation, against the fees due to SunDance for services rendered.

42. Also, on September 3, 2003, as further consideration for Letter 1, THCI, acting on behalf of itself and the New Operators, and Sun, acting on behalf of itself and the Sun Tenants, entered into the following modification of ¶6.1 of each of the OTAs:

> The undersigned hereby agree that, notwithstanding anything in the OTAs . . . to the contrary, all references in Section 6.1 of each of the respective [OTAs] . . . (a) to "Lenders" shall mean [CapitalSource and Wells Fargo] (and their successors and assigns), (b) to "Credit Agreement" shall mean that certain Loan and Security Agreement of September ___ 2003 between Lenders and Sun . . . and (c) to "Agents" shall mean [CapitalSource] as agent. The undersigned acknowledge and agree that the Lenders will rely upon this agreement in entering into the Credit Agreement and relative to the Lenders' treatment of each of the Sun Tenant's A/R . . . under the Credit Agreement.

43. As of December 1, 2003, despite their agreement to the provisions of Letter 1 and the additional consideration they had

unscrupulously obtained during the negotiations of same, the THCI Entities remained delinquent in their payment for SunDance's services in excess of **$5.2 million**.

44. On December 1, 2003, Sun and THCI, acting on their own behalves and on behalf of the Sun Entities and the THCI Entities, respectively, entered into another letter agreement ("Letter 2").

45. Letter 2 permitted the THCI Entities to set off additional taxes on the Facilities that had accrued against the more than **$5.2 million** in unpaid fees to SunDance for services rendered.

46. Even since December 1, 2003, the THCI Entities have continued to be delinquent in their payments for services provided by SunDance. Although not sought in this action, these delinquent fees evidence the pattern of bad faith, breach of contract and wrongful conduct engaged in by Defendants throughout the parties' dealings.

47. Similarly evidential of Defendants' continuing bad faith, contractual breaches and wrongful conduct are the undelivered accounts receivable due certain affiliates of the Sun Entities under operating transfer agreements executed as part of the settlement under the First Stipulation and/or the

Supplemental Stipulation. These accounts receivable were to be treated by affiliates of the THCI Entities in a similar fashion as the Sun Tenant A/R under the OTAs referred to throughout this Complaint, and claims of the breach of those contractual requirements remain unresolved as "Excluded Prior OTA Claims" exempted from the release provisions of the Stipulation, as per ¶¶1(h) and 13(a).

48. §6.2 of each of the OTAs provides as follows:

> Within ten (10) business days after the Possession Date, Sun Tenant shall provide New Operator with a schedule setting forth by patient its outstanding accounts receivable with respect to the Facility as of the Possession Date.

49. The total of all of the Sun Tenant A/R, as reported by the Sun Tenants, in compliance with §6.2, by or shortly after their respective Possession Dates, was **$60,353,896.**

50. §6.3 of each of the OTAs provides as follows:

> Payments received by New Operator from and after the Possession Date from third party payors, including but not limited to Medicare, Medicaid, VA, managed care and health insurance, shall be handled as follows:

> 6.3.1 If such payments either specifically indicate on the accompanying remittance advice, or if the parties agree, that they relate to the period prior to the Possession Date, they shall be forwarded to Sun Tenant by

New Operator, along with the applicable remittance advice, within five (5) business days after receipt thereof;

6.3.2    If such payments indicate on the accompanying remittance advice, or if the parties agree, that they relate to the period on or after the Possession Date they shall be retained by New Operator; and

6.3.3    If the period(s) for which such payments are made is not indicated on the accompanying remittance advice, and the parties are unable to agree as to the periods to which such payments relate, the parties shall assume that each payment relates to the oldest outstanding unpaid receivables for reimbursement and, based on such assumption, the portion thereof which relates to the period on and after the Possession Date shall be retained by New Operator and the balance shall be remitted to Sun Tenant within five (5) business days after New Operator's receipt thereof.

51.   §6.4 of each of the OTAs provides as follows:

Any payments received by New Operator during the first ninety (90) days after the Possession Date from or on behalf of private pay patients with outstanding balances as of the Possession Date which fail to designate the period to which they relate, will first be applied by New Operator to reduce the patients' pre-Possession Date balances, with any excess applied to reduce any balances due for services rendered by New Operator after the Possession Date. Thereafter all non-designated payments will first be applied to any post-Possession Date

balances, with the excess, if any, applied
to the extent of any balances due for
services rendered by Sun Tenant prior to the
Possession Date.

52.    §6.7 of each of the OTAs provides as follows:

For the twelve (12) month period following
the Possession Date or until Sun Tenant
receives payment of all accounts receivable
attributed to the operation of the Facility
prior to the Possession Date, whichever is
sooner, New Operator shall provide Sun
Tenant with (i) an accounting by the 20th day
of each month setting forth all amounts
received by New Operator during the
preceding month with respect to Sun Tenant's
A/R which are set forth in the schedule
provided by Sun Tenant pursuant to Section
6.2 and (ii) copies of all remittance
advices relating to such amounts received
and any other reasonable supporting
documentation as may be required for Sun
Tenant to determine the Sun Tenant's A/R
that has been paid.    New Operator shall
deliver such accounting to Sun Tenant at the
following address: **A/R Disposition Manager,
Corporate Accounting, 101 Sun Avenue, NE,
Albuquerque, NM 87109.**    Sun Tenant shall
have the right to inspect all cash receipts
of New Operator during weekday business
hours in order to confirm New Operator's
compliance with the obligations imposed on
it under this Section.

53.    §6.8 of each of the OTAs provides as follows:

Failure of either party to forward to the
other party any payment received by such
party in accordance with the terms of this
Section 6, shall entitle the other party
(among all other remedies allowed by law and
this Agreement) to interest on the amount
owed at the rate per annum equal to the

Prime Rate as set forth in the Money Rates
Section of The Wall Street Journal, as the
same may change from time to time, plus 5%,
simple interest, until such payment has been
paid.  The payment of any interest imposed
under this Section 6, if any, shall be made
together with the underlying payment
therefore.

54. §6.9 of each of the OTAs provides as follows:

The obligations of the parties to forward
the accounts receivable payments pursuant to
this Section 6 are absolute and
unconditional and irrespective of any
circumstances whatsoever which might
constitute a legal or equitable discharge,
recoupment, offset, counterclaim or defense
of the parties, the right to assert any of
which with respect to proceeds of any
accounts receivable is hereby waived.  All
obligations under this Agreement, including
without limitation the obligation under this
Article 6, shall survive the issuance of the
Licensure Approval, the Possession Date and
the transfer of the operations of the
Facility to the New Operator.

55. §6.10 of each of the OTAs provides as follows:

If and to the extent New Operator enters
into a financing arrangement with a lender
pursuant to which the accounts receivable of
the Facility related to the period from and
after the Possession Date are collateral for
such financing (a "New Operator Lender"),
New Operator shall advise Sun Tenant of the
existence of such financing and shall cause
the New Operator Lender to deliver a written
instrument, in the form attached hereto as
Exhibit G ("Lender Acknowledgment") and
addressed to, Sun Tenant, the Lenders and
Agent, confirming that the New Operator

Lender has no lien on, or interest in, the
Sun Tenant A/R.

56. As each of the Possession Dates occurred, THCI and all
of the New Operators entered into financing arrangements
collectively covering all of the Facilities with Care Realty
Funding, LLC ("Care Realty Funding"), a THCI Entity and "New
Operator Lender" under each of the OTAs.

57. In connection with each of the aforementioned
financing arrangements, Care Realty Funding executed Lender
Acknowledgments on April 30, June 18, and July 28, 2003.

58. Each of the Lender Acknowledgments provides as
follows:

> This letter will serve to confirm that,
> notwithstanding anything to the contrary
> which may be set forth in any agreements
> between [the New Operator] Lender and [THCI
> or the New Operator, whichever was the
> "Borrower" under the agreement with the New
> Operator Lender,] the [New Operator] Lender
> acknowledges that it has no interest in, or
> lien on, the [Sun Tenant] A/R and agrees to
> hold in trust for [the Sun Lenders'] benefit
> and to remit promptly to [the Agent] . . .
> any of the [Sun Tenant] A/R which it may
> receive at any time after the Possession
> Date.  In determining whether any payment
> received by the [New Operator] Lender
> constitutes [Sun Tenant] A/R, [the New
> Operator] Lender agrees to be bound by
> written instructions received from [a Sun
> Entity identified in the Lender
> Acknowledgement] or the . . . Agent and
> without limiting the foregoing, if a payment

received by the [New Operator] Lender does not indicate whether it is in respect of a period before or after the Possession Date, it shall be assumed that such payment relates to the oldest outstanding unpaid receivable and applied accordingly.

59.  Upon information and belief, the New Operator Lender has received Sun Tenant A/R, which it has not delivered to any of the Sun Entities, the Sun Lenders or their Agents.

60.  §8.2 of each of the OTAs provides as follows:

From and after the Possession Date, New Operator shall allow Sun Tenant and its agents and representatives (including, without limitation, any financial institutions having an interest in Sun Tenant's AR) to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, the books and records and supporting material of the Facility relating to the period prior to and including Possession Date, to the extent reasonably necessary to enable Sun Tenant to [sic] among other things . . . complete/revise, as needed, any patient assessments which may be required for Sun Tenant to seek reimbursement for services rendered prior to the Possession Date, to verify accounts receivable collections due Sun Tenant and to file exceptions to the Medicare routine cost limits for the cost reporting periods prior to and including the Possession Date.

61.  §8.3 of each of the OTAs provides as follows:

Sun Tenant shall have the right, at Sun Tenant's sole cost and expense, within five (5) days of the delivery of a request therefore to New Operator to enter the

Facility and remove originals or copies of any such records delivered to New Operator, provided, however, if directed by Sun Tenant in its request to New Operator, New Operator shall within such five day period, forward such records to Sun Tenant to the address designated by Sun Tenant; . . . Any record so removed shall promptly be returned to New Operator following its use, and nothing herein shall be interpreted to prohibit New Operator from retaining copies of any such documents.

62.   §8.6 of each of the OTAs provides as follows:

New Operator acknowledges and agrees that the books, records and other materials described in this Section 8 are unique, that in the event of a breach by New Operator of its obligations under this Section 8, Sun Tenant would suffer injury for which it would not be fully compensated with monetary damages and accordingly that in the event of a breach by New Operator of its obligations under this Section 8, Sun Tenant shall be entitled to seek to enjoin a breach by New Operator of its obligations under this Section 8 and/or to specifically enforce the obligations of New Operator hereunder.

63.   ¶26 of the Stipulation provides as follows:

In any action or proceeding brought by a Party hereto against any other Party hereto to enforce any provision of this Stipulation, or to seek damages for a breach of any provision hereof, or where any provision hereof is validly asserted as a defense, the prevailing Party shall be entitled to recover reasonable attorneys' fees from the other Party in addition to any other available remedy.

64.   §23 of each of the OTAs provides as follows:

> In the event of a dispute between the parties hereto with respect to the interpretation or enforcement of the terms hereof, the prevailing party shall be entitled to collect from the other its reasonable costs and attorneys fees, including its costs and fees on appeal.

65. Beginning on the various Possession Dates applying to the Facilities, the performance of the New Operators under Sections 6 and 8 of the OTAs was varied, ranging from sporadic initial compliance, followed by diminishing further compliance as time passed, to utter failure to comply from the outset. Some New Operators initially provided the reporting required by §6.7 and the access to records required generally by Article 8 and remitted some payments in accordance with §§6.1, 6.3 and 6.4, while others immediately refused to comply with their Article 6 obligations or cooperate with the Sun Tenants' efforts to audit the Sun Tenant A/R, as permitted by the various subsections of Article 8.

66. Eventually, all of the New Operators ceased complying altogether with any of their obligations under Articles 6 and 8.

## THE CLAIMS

67. As of December 18, 2003, Sun had been able to verify, through those records obtained from whichever New Operators had, for a time, complied with the reporting provisions of Article 6

and the record-keeping provisions of Article 8 of their respective OTAs and/or other sources independently available to Sun, that the value of the Sun Tenant A/R received by various New Operators and not delivered in accordance with the provisions of Article 6 was at least **$1,319,419**.

68.  On December 18, 2003, a letter was forwarded to THCI, some of its affiliates and its counsel by the Sun Entities, demanding compliance with the provisions of Articles 6 and 8 of each of the OTAs.

69.  Upon receipt of the December 18, 2003 letter, THCI responded via email asking for documentation to support the amount owed to the Sun Entities despite THCI having withheld that very same documentation from the Sun Entities in direct violation of the OTAs.

70.  On December 24, 2003, a letter was forwarded to THCI, some of its affiliates and its counsel by the Sun Entities, (i) responding to the above described email, (ii) again demanding that THCI comply with the provisions of the OTAs requiring that THCI supply the requisite documentation, and (iii) supplying documentation of payments received by THCI for services rendered by the Sun Entities.

71. On February 10, 2004, having received no substantive response to its prior letters, the Sun Entities delivered another letter to THCI demanding compliance with the provisions of Articles 6 and 8 of each of the OTAs, and that THCI pay all amounts due thereunder, then estimated to be at least $2,558,123.94.

72. Additionally, Care Realty Funding has not complied with any of its obligations under the Lender Acknowledgements.

73. Demand has been made upon Care Realty Funding for the remittance of any and all Sun Tenant A/R it has received and not yet delivered and an accounting of all such funds, but no response has yet been received to said demand.

74. As a direct and proximate result of the breaches of the OTAs, the OTA Assignment and Assumptions and the Lender Acknowledgements, in addition to the obvious impairment of the Sun Entities' ability to fulfill their obligations to repay the Sun Lenders, the Sun Entities have suffered and will continue to suffer significant prejudice in their ability to ever collect the full amount of the valid Sun Tenant A/R. Said prejudice is due to the expiration of regulatory and contractual time periods within which the Sun Entities had to respond to information requests and/or reimbursement denials and from the New

Operators' failure to deliver or make available Medicare, Medicaid and other payor remittance advices necessary for the Sun Entities to make any such responses.

75. The Sun Entities' inability to report to Sun Lenders as to the status and quantum of collectible receivables, which are the subject of Article 6 of each of the OTAs, and the likely diminution of those receivables based upon the expiration of the applicable deadlines referred to in the preceding paragraph, have had and will continue to have a significant impact upon the credit available to the Sun Entities under the Loan and Security Agreement, by virtue of the following provisions of the Loan and Security Agreement:

> **"Borrowing Base"** shall mean, as of any date of determination, an amount equal to (a) eighty-five percent (85%) of the U.S. Dollar value of Eligible Receivables plus eighty-five percent (85%) of the U.S. Dollar value of Eligible Divested Company Receivables, as determined with reference to the most recent Borrowing Base Certificate and otherwise in accordance with the Agreement; <u>provided</u>, <u>however</u>, that if the period covered by the most recent Borrowing Base Certificate ends on a date that is earlier than the Wednesday of the second calendar week before such date of determination, the Borrowing Base shall be determined by Lender in its sole discretion; less such reserves as Collateral Agent, in its reasonable business discretion, may deem appropriate from time to time, including, without limitation, reserves with respect to all recoupments and

overpayments whether or not disclosed pursuant to subsection 4.23.

. . .

**"Eligible Divested Company Receivables"** shall mean each Account where facilities generating such Account are being or have been transitioned to another operator arising in the ordinary course of a Borrower's business from the sale of goods or rendering of Services which Collateral Agent, in its sole discretion, deems an Eligible Divested Company Receivable unless: (a) any of (a) through (u) does not exist as specified in the definition of "Eligible Receivables" (but under (e) "one hundred fifty (150) days" shall instead be "one hundred twenty (120) days"); (b) the operator to which the facilities being transitioned is not acceptable to Collateral Agent in its sole discretion; or (c) there is not in place an agreement between the applicable Borrower and such new operator (and an acknowledgement by such new operator in favor of Lenders), satisfactory to Collateral Agent in its sole discretion, providing that the pre-transition receivables are the applicable Borrower's property and that collections will be remitted to the applicable Borrower (or Lenders, at Collateral Agent's discretion) and requiring any lender of such new operator holding a lien on such new operating receivables to execute an acknowledgment in form satisfactory to Collateral Agent in its sole discretion (including an acknowledgment that the pre-transition receivables are the applicable Borrower's property and that collections thereof will be remitted to the applicable Borrower (or Lenders, at Collateral Agent's discretion)).

76.  The Sun Entities have been irreparably injured and will continue to be irreparably injured by the reduction of their Borrowing Base under the Loan and Security Agreement resulting from the breaches by the Defendants of their obligations under Articles 6 and 8 of each of the OTAs.

77.  The Sun Entities have been able to confirm through those records and reports received from the New Operators, as well as other independent sources, that the New Operators have collected at least **$2,558,123.94** (as of December 31, 2003) in Sun Tenant A/R that has not been remitted to the Sun Entities or the Sun Lenders.

78.  Upon information and belief, the New Operators have, in fact, collected an aggregate amount of Sun Tenant A/R in the approximate sum of **$11,000,000** that Defendants have failed to either remit or account for.

## CAUSES OF ACTION

### FIRST COUNT

### EXPRESS TRUST

79.  Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 78.

80.  The Sections 6.1 of the OTAs collectively created a trust, the corpus of which consisted of the Sun Tenant A/R.

81.  Following the modification on September 3, 2003 and the execution of the Loan and Security Agreement on September 5, 2003, the Sun Lenders and their Agents were beneficiaries of the trust.   The Sun Lenders were also express third party beneficiaries of the OTAs, as per §6.1 of each.

82.  Defendants were the fiduciaries of these express trusts, obligated to turn over Sun Tenant A/R in accordance with the provisions of §§6.1, 6.3 and 6.4 of the OTAs.

83.  Pursuant to §§6.1 and 6.3, Plaintiffs were co-fiduciaries, as well as beneficiaries, of the trust and were to receive Sun Tenant A/R remittances from the New Operators, directly.

84.  All of the obligations of the New Operators under the OTAs were also obligations of all Defendants under the Stipulation, into which the OTAs had been incorporated by reference.

85.  The failure of Defendants to comply with the provisions of Article 6 of the OTAs represents a breach of their fiduciary duties to both the Sun Lenders and Plaintiffs.

86. Plaintiffs, as co-fiduciaries, assert the breach of the fiduciary obligations of Defendants on Plaintiffs' own behalves and on the behalves of the Sun Lenders.

87. As a direct and proximate result of the breach of these fiduciary obligations by Defendants, Plaintiffs and the Sun Lenders have suffered and will continue to suffer significant financial losses.

### SECOND COUNT

### CONSTRUCTIVE TRUST

88. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 87.

89. Defendants, pursuant to Article 6 of the OTAs, were the recipients of the Sun Tenant A/R on behalf of Plaintiffs and the Sun Lenders.

90. The receipt of Sun Tenant A/R pursuant to §6 of the OTAs should be held to have created a constructive trust, with the Sun Lenders as beneficiaries and Plaintiffs as beneficiaries and co-fiduciaries.

## THIRD COUNT

## CONVERSION

91.  Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 90.

92.  Pursuant to §6.1 of the OTAs, the Sun Tenant A/R remained the property of Plaintiffs.

93.  Upon information and belief, the New Operator Lender has knowingly received Sun Tenant A/R and has, in violation of its obligations pursuant to the Lender Acknowledgements, retained same rather than delivering same to Plaintiffs, the Sun Lenders or their Agents.

94.  Defendants knowingly and intentionally refused to deliver to Plaintiffs the Sun Tenant A/R in Defendants' possession.

95.  Defendants, instead, converted those Sun Tenant A/R received by Defendants for their own benefit.

96.  As a direct and proximate result of the conversion of Sun Tenant A/R by Defendants, Plaintiffs and the Sun Lenders have suffered and will continue to suffer significant financial losses.

## FOURTH COUNT

## BREACH OF CONTRACT

97. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 96.

98. Defendants had duties under §§6.1, 6.3 and 6.4 of the OTAs to deliver Sun Tenant A/R to Plaintiffs.

99. Defendants had duties under §6.7 of the OTAs to report to Plaintiffs regarding the status of Sun Tenant A/R and the efforts to collect same.

100. Defendants had duties under §6.7 and Article 8 of the OTAs to keep and make available to Plaintiffs adequate records regarding the Sun Tenant A/R and efforts to collect same.

101. Care Realty Funding had an obligation under the Lender Acknowledgements to turn over Sun Tenant A/R in its possession.

102. Defendants breached each of the contractual obligations owed to Plaintiffs that are described in this Count.

103. As a direct and proximate result of Defendants breaches of the contractual obligations contained in the OTAs and incorporated by reference in the Stipulation, Plaintiffs have suffered and will continue to suffer significant financial losses.

### FIFTH COUNT

### UNJUST ENRICHMENT

104. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 103.

105. Defendants' continued retention of Sun Tenant A/R is wholly without justification.

106. Pursuant to the express terms of Article 6, Defendants are prohibited from applying any amounts allegedly due from any Sun Entities as set-offs or counterclaims against Defendants' obligations to deliver all Sun Tenant A/R in their possession.

107. Defendants have been unjustly enriched by their retention and use of the Sun Tenant A/R in their possession.

### SIXTH COUNT

### FRAUD

108. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 107.

109. Defendants represented, during the negotiations of and specifically by executing the Stipulation, the OTAs, Letter 1 and Letter 2 that they would abide by the various provisions of Articles 6 and 8 of the OTAs.

110. Upon information and belief, Defendants' representations described in this Count were false at the time they were made.

111. Upon information and belief, Defendants made the misrepresentations described in this Count with the knowledge that they were false and the intention that Plaintiffs rely upon them.

112. Plaintiffs did, in fact, rely upon the misrepresentations of Defendants described in this Count, and Plaintiffs' reliance was reasonable under all of the attendant circumstances.

113. As a direct and proximate result of Plaintiffs' reasonable reliance upon the knowing and intentional misrepresentations of Defendants, Plaintiffs have suffered and will continue to suffer significant financial losses.

**SEVENTH COUNT**

**EXEMPLARY DAMAGES**

114. Plaintiffs incorporate herein by reference the allegations contained in paragraphs 1 through 113.

115. Defendants' intentional torts, referred to in the preceding Counts, were committed willfully and with malice or, at least, with wanton disregard for the rights of Plaintiffs.

-46-

116. Consequently, Defendants are liable for exemplary damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for the following relief:

a) As to the First and Second Counts, an accounting of all Sun Tenant A/R received by Defendants to date and the status of efforts to collect any remaining Sun Tenant A/R;

b) As to the First and Second Counts, the disgorgement of all Sun Tenant A/R received by Defendants to date;

c) As to the Fourth Count, an accounting in the form required by §6.7 of the OTAs of all Sun Tenant A/R received by Defendants to date and the status of efforts to collect any remaining Sun Tenant A/R;

d) As to the Fourth Count, specific performance, as per §8.6 of the OTAs, of the record-keeping and production provisions of Article 8 of the OTAs;

e) As to all counts, compensatory damages;

f) As to all counts, pre- and post-judgment interest;

g) As to the First, Second, Third and Sixth Counts, and pursuant to the allegations of the Seventh Count, exemplary damages;

h)   As to the First, Second and Fourth Count, attorneys'
     fees;

i)   As to all counts, costs of suit; and

j)   As to any count to which it may apply, such further
     relief as this Court deems just.

## DEMAND FOR TRIAL BY JURY

The Plaintiffs hereby demand a trial by jury on all issues so triable.

## CORPORATE DISCLOSURE STATEMENT PURSUANT TO FED.R.CIV.P. 7.1

Sun Healthcare Group, Inc. is the parent, directly or indirectly, of each of the other Plaintiffs and has no parent company, itself. Sun Healthcare Group, Inc. is a publicly traded corporation; none of the other Plaintiffs are publicly traded.

NEWMAN & SIMPSON, LLP


BY:_____
     DANIEL P. SIMPSON (DS9856)

NEWMAN & SIMPSON, LLP
32 Mercer Street
Hackensack, New Jersey 07601
(201) 487-0200
Attorneys for Plaintiffs

DATED:  March 23, 2004

## RULE 11.2 CERTIFICATION

The undersigned certifies that the matter in controversy is not the subject of any other action pending in any court, arbitration or administrative proceeding. A case pending in the Jefferson County District Court of the State of Colorado captioned *THCI Mortgage Holding Company, LLC, 8451 Pearl Street, LLC, and 8451 Pearl Street Operating Company, LLC v. Sun Healthcare Group, Inc.*, Case No. 04CV0169, involves discrete local claims.

NEWMAN & SIMPSON, LLP


BY: _____
    DANIEL P. SIMPSON (DS9856)

NEWMAN & SIMPSON, LLP
32 Mercer Street
Hackensack, New Jersey 07601
(201) 487-0200
Attorneys for Plaintiffs

DATED:  March 23, 2004

## RULE 201.1 CERTIFICATION

The undersigned certifies that the above-captioned matter is not subject to compulsory arbitration in that the plaintiffs seek, *inter alia*, relief in the forms of an accounting, disgorgement of trust funds, and damages exceeding the sum of $150,000 exclusive of interest, costs and punitive damages.

NEWMAN & SIMPSON, LLP

BY: _____

    DANIEL P. SIMPSON (DS9856)

NEWMAN & SIMPSON, LLP
32 Mercer Street
Hackensack, New Jersey 07601
(201) 487-0200
Attorneys for Plaintiffs

DATED:  March 23, 2004